## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **GREENSTATE CREDIT UNION, on Behalf of Itself and All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**HY-VEE, INC.,**<br><br>**Defendant.** | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff GreenState Credit Union ("Plaintiff"), on behalf of itself and all others similarly situated, asserts the following against Defendant Hy-Vee, Inc. ("Hy-Vee" or "Defendant"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## I.    INTRODUCTION

1.    Plaintiff brings this class action on behalf of financial institutions that suffered, and continue to suffer, financial losses as a direct result of Hy-Vee's conscious failure to take adequate and reasonable measures to protect its point-of-sale payment terminals and payment card data environment. Hy-Vee's actions left highly sensitive Payment Card Data, including, but not limited to, the cardholder name, credit or debit card number, and expiration date (collectively "Payment Card Data") of Plaintiff's members/customers exposed and accessible for use by hackers from approximately November 9, 2018 to August 2, 2019, at which time Hy-Vee claims the breach was finally

contained. Plaintiff subsequently received notification from MasterCard that approximately twenty-nine thousand (29,000) of its payment cards were compromised in the Hy-Vee data breach. As a result, Plaintiff has and will incur significant property and financial damages in replacing members/customers' payment cards and covering fraudulent purchases, among other things.

2.      Beginning on or around November 9, 2018, computer hackers accessed Hy-Vee's inadequately protected point-of-sale systems and began installing malicious software (often referred to as "malware") that infected a large number of point-of-sale devices at certain Hy-Vee fuel pumps, drive-thru coffee shops, and restaurants.[1] Through this malware, hackers stole the Payment Card Data of an untold number of customers.[2]

3.      The Data Breach was the inevitable result of Hy-Vee's inadequate data security measures and lackadaisical approach to the security of its customers' Payment Card Data. Despite the well-publicized and ever-growing threat of cyber-attacks targeting Payment Card Data through vulnerable point-of-sale systems and inadequately protected computer networks, Hy-Vee refused to implement certain best practices, failed to upgrade critical security systems, used outdated point-of-sale systems, ignored warnings about the vulnerability of its computer network, and disregarded and/or violated applicable industry standards.

---

[1]      Hy-Vee, Hy-Vee Reports Findings from Investigation of Payment Card Data Incident, https://www.hy-vee.com/paymentcardincident/ (Oct. 3, 2019) (last accessed Jan. 31, 2020).
[2]      Hereinafter, these events are referred to as the "Hy-Vee Data Breach" or "Data Breach."

4.      Hy-Vee's data security deficiencies were amplified by its failure to timely identify the Data Breach and subsequently contain it. By August 14, 2019, when Hy-Vee first publicly acknowledged that a data breach compromising customer Payment Card Data had occurred, the Data Breach already had been ongoing for several months. The malware had remained undetected within Hy-Vee's point-of-sale and computer systems from as early as November 9, 2018 at six locations, December 14, 2018 at numerous fuel pumps, and January 15, 2019 for restaurants and drive-thru coffee shops. Hy-Vee did not detect unauthorized activity until July 29, 2019.

5.      The financial costs caused by Hy-Vee's deficient data security approach have been and will be borne primarily by financial institutions, like Plaintiff, that issued the payment cards compromised in the Data Breach. These costs include, but are not limited to, canceling and reissuing compromised cards and reimbursing their members/customers for fraudulent charges. Moreover, the duration of the Data Breach has caused and will continue to cause Plaintiff and other members of the Class to suffer many millions of dollars more in damages than they would have suffered if Hy-Vee had an adequate process in place to detect and contain the data breach.

6.      This class action is brought on behalf of financial institutions throughout the U.S. to recover the damages that they and others similarly situated have suffered, and continue to suffer, as a direct result of the Hy-Vee Data Breach. Plaintiff asserts claims for negligence, negligence *per se*, and declaratory and injunctive relief.

## II.    PARTIES

### A.    Plaintiff

7.    Plaintiff GreenState Federal Credit Union is a citizen of the Commonwealth of Iowa. Plaintiff is a federally chartered credit union with its principal place of business located in North Liberty, Iowa. Plaintiff has members in a multitude of states, including Minnesota, and has members whose payment cards were compromised in the Data Breach after they were used at Hy-Vee locations, including locations in Minnesota.

8.    Plaintiff offers payment cards to its members.  Plaintiff invests considerable time and expense in opening payment card accounts, creating and assigning unique individual card numbers, card verification values ("CVV numbers"), and expiration dates to the accounts, and manufacturing and issuing to its members physical payment cards with magnetic strips and/or chips containing this information. These unique, electronically-created and maintained accounts and the physical payment cards with such proprietary data contained therein are valuable property to Plaintiff because they provide an important service and functionality to members, and their use generates revenue for Plaintiff.

9.    In turn, Plaintiff's members use their payment cards to purchase goods and services from a wide variety of merchants, including Hy-Vee locations in multiple states.

10.    As a result of the Hy-Vee Data Breach, Plaintiff GreenState Credit Union has suffered, and continues to suffer, injury, including, *inter alia*, direct property damage to its payment cards and the proprietary data contained therein, resulting in costs to cancel and reissue cards compromised in the Data Breach, costs to refund fraudulent charges, costs to

investigate fraudulent charges, and costs due to lost interest and transaction fees due to reduced card usage.

11.    Plaintiff is at risk of imminent and certain impending injury as a result of recurrent fraudulent transactions on payment cards linked to the Hy-Vee Data Breach. Furthermore, Plaintiff is subject to an imminent threat of future harm because Hy-Vee's response to the Data Breach is so inadequate that it is doubtful that it has cured the deficiencies in its data security measures sufficiently to prevent a subsequent data breach.

**B.    Defendant.**

12.    Defendant Hy-Vee, Inc. is a privately-held Iowa corporation with its principal place of business at 5820 Westown Parkway, West Des Moines, Iowa 50266. It is a citizen of Iowa.

13.    Hy-Vee is engaged in the business of developing and operating a system of supermarket locations, fuel pumps, convenience stores, gas stations, and coffee shops throughout the Midwest. Hy-Vee currently operates more than 240 retail stores in eight Midwestern states, including Minnesota, Iowa, Illinois, Kansas, Missouri, Nebraska, South Dakota, and Wisconsin. Hy-Vee owns and operates locations under various brand names, including Hy-Vee, Hy-Vee Gas, Market Grille, Market Grille Express, and certain Wahlburgers locations, including one in the Mall of America in Bloomington, Minnesota; a location in West Des Moines, Iowa; and a location in Olathe, Kansas.

14.    Upon information and belief, Hy-Vee has total control over the manner in which its more than 240 locations operate, including those locations' computer software and electronic data transmission systems for point of sale reporting.

### III.   JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d), because at least one Class member is of diverse citizenship from one defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

16.     This Court has personal jurisdiction over Hy-Vee.  Hy-Vee has sufficient minimum contacts with the state of Minnesota – including the operation of numerous stores in Minnesota – and intentionally avails itself of the consumers and markets within the state of Minnesota through the promotion, marketing, and sale of its products and services in Minnesota, and because Defendant conducts substantial business in Minnesota and this District through its supermarkets and commercial website. Further, Plaintiff's members have used their payment cards to make purchases at Hy-Vee locations within Minnesota, and at least one payment card issued by Plaintiff was compromised in the Hy-Vee Data Breach after being used by a member at a Hy-Vee location in Minnesota.

17.     Venue is proper in this District under 28 U.S.C. §1391(a)(2) because Defendant conducts substantial business in this district and is subject to the Minnesota Plastic Card Security Act, Minn. Stat. § 325E.64.  A substantial part of the events, errors, omissions, and decisions leading to the Data Breach occurred in this District, including, as stated above, the compromise of at least one payment card issued by Plaintiff after being used at a Hy-Vee location within this District.

6

## IV.    FACTUAL ALLEGATIONS

### A.    Payment Card Processing Background

18.    It is well known that customer Payment Card Data is valuable and often targeted by hackers. Over the last several years, numerous data breaches have occurred at large retailers and restaurants nationwide, including Wendy's, The Home Depot, Target, Kmart, P.F. Chang's, and many others. Despite widespread publicity and industry alerts regarding these other notable data breaches, Hy-Vee failed to take reasonable steps to adequately protect its computer systems from being breached.

19.    A large portion of Hy-Vee's sales are made to customers who use credit or debit cards. When a customer uses a credit or debit card, the transaction involves four primary parties: (1) the "merchant" (*e.g.*, Hy-Vee) where the purchase is made; (2) an "acquiring bank" (which typically is a financial institution that contracts with the merchant to process its payment card transactions); (3) a "card network" or "payment processor" (such as Visa and MasterCard); and (4) the "issuer" (which is a financial institution – such as Plaintiff – that issues credit and debit cards to its members/customers).

20.    Processing a payment card transaction involves four major steps:

- *Authorization* – when a customer presents a card to make a purchase, Hy-Vee requests authorization of the transaction from the card's issuer;

- *Clearance* – if the issuer authorizes the transaction, Hy-Vee completes the sale to the customer and forwards a purchase receipt to the acquiring bank with which it has contracted;

- *Settlement* – the acquiring bank pays Hy-Vee for the purchase and forwards the receipt to the issuer, which then reimburses the acquiring bank; and

- *Post-Settlement* – the issuer posts the charge to the customer's credit or debit account.

21.    In processing payment card transactions, merchants acquire a substantial amount of information about each customer, including his or her full name; credit or debit card account number; card security code (the value printed on the card or contained in the microprocessor chip or magnetic strip of a card and used to validate card information during the authorization process); the card's expiration date and verification value; and the PIN number for debit cards.[3]



---

[3]    *See* PCI Security Standards Council, *PCI DSS Quick Reference Guide: Understanding the Payment Card Industry Data Security Standard version 3.2.1*, 11, July 2018, https://www.pcisecuritystandards.org/documents/PCI_DSS-QRG-v3_2_1.pdf (last accessed Jan. 21, 2020).

22.     Merchants typically store this information on their computer systems and transmit it to third parties to complete the transaction. At other times, and for other reasons, merchants may also collect other personally identifiable information about their customers, including, but not limited to, financial data, mailing addresses, phone numbers, driver's license numbers, and email addresses.

23.     For years, Hy-Vee has obtained massive amounts of customer Payment Card Data. Hy-Vee uses this information to process payment card transactions in connection with sales to its customers. Customer Payment Card Data is an asset of considerable value to both the Hy-Vee and to hackers, who can easily sell this data, as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[4]

24.     Hy-Vee is—and at all relevant times has been—aware that the Payment Card Data it obtains and processes is valuable, highly sensitive, and could be used for nefarious purposes by third parties, such as perpetrating identity theft and making fraudulent purchases.

25.     Hy-Vee also is—and at all relevant times has been—aware of the importance of safeguarding its customers' Payment Card Data and of the foreseeable consequences that would occur if its data security systems were breached, specifically including the fraud losses and theft that would be imposed on consumers, such as Plaintiff.

---

[4]     *The Value of a Hacked Company*, KREBS ON SECURITY (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last accessed Jan. 21, 2020).

26.    In addition to its general duty to act reasonably in handling and safeguarding customers' Payment Card Data to prevent the risk of foreseeable harm to others, Hy-Vee is—and at all relevant times has been—obligated to safeguard such information by, among other things, industry standards, federal law, and its own commitments, internal policies, and procedures.

**B.    The Hy-Vee Data Breach: November 2018 to August 2019**

27.    Beginning as early as November 2018, computer hackers took advantage of vulnerabilities in Hy-Vee's computer and point-of-sale systems to install malware at a large number of Hy-Vee's owned and/or operated gas stations, drive-thru coffee shops, and restaurants. Through this malware, the hackers were able to steal Hy-Vee customers' Payment Card Data that Hy-Vee had collected in conjunction with its customers' purchases.

28.    On August 14, 2019 (approximately ten months after hackers first installed malware at six locations), Hy-Vee announced that it was investigating a theft of its customers' Payment Card Data. In a follow-up announcement on October 3, 2019, Hy-Vee disclosed that its first detection of unauthorized activity was on July 29, 2019. Hy-Vee explained, "[t]he malware searched for track data (which sometimes has the cardholder name in addition to card number, expiration date, and internal verification code) read from a payment card as it was being routed through the POS device."[5]

_____

[5]    Hy-Vee, Hy-Vee Reports Findings from Investigation of Payment Card Data Incident, https://www.hy-vee.com/paymentcardincident/ (Oct. 3, 2019) (last accessed Jan. 31, 2020).

29.    Taking advantage of Hy-Vee's lax data security and delay in discovering the malware on its systems, hackers were able to gather large amounts of Payment Card Data. A highly respected investigative cybersecurity journalist reported shortly after Hy-Vee's initial announcement that a batch of 5.3 million account numbers were available for sale on the dark web, and that multiple sources told him the account numbers came from the Hy-Vee breach.[6]

30.    With that Payment Card Data, unknown perpetrators are now capable of making undetected fraudulent purchases on credit and debit cards belonging to Plaintiff and members of the Class. Unknown perpetrators are also capable of specifically targeting and draining debit accounts with large amounts of money in them belonging to Plaintiff and members of the Class. By failing to timely identify that its systems had been subjected to a data breach, Hy-Vee allowed hackers to have unfettered access to Hy-Vee computer and point-of-sale systems to obtain customers' Payment Card Data for between eight and ten months, thereby exponentially increasing the harm suffered by Plaintiff and members of the Class.

31.    This exposure of a large volume of Plaintiff's members' Payment Card Data has forced Plaintiff to close accounts and reissue payment cards to prevent fraud. This renders the exposed Payment Card Data and the physical cards useless and valueless,

---

[6]    Brian Krebs, KrebsonSecurity, Breach at Hy-Vee Supermarket Chain Tied to Sale of 5M+ Stolen Credit, Debit Cards, Aug. 19, 2019, https://krebsonsecurity.com/2019/08/breach-at-hy-vee-supermarket-chain-tied-to-sale-of-5m-stolen-credit-debit-cards/ (last accessed Jan. 31, 2020).

destroying Plaintiff's investment of time and money to create those accounts and cards, and requiring additional expenditures to create new numbers and cards.

32.    Up to, and including, the period during which the Hy-Vee Data Breach occurred, Hy-Vee's data security systems suffered from many deficiencies that made them susceptible to hackers, including, without limitation, the following:

a.    Hy-Vee's IT management were un- or under-qualified and failed to maintain a system of accountability over data security, thereby knowingly allowing data security deficiencies to persist;

b.    Hy-Vee ignored well-known warnings that its point-of-sale systems were susceptible to data breach;

c.    Hy-Vee failed to implement certain protocols that would have prevented unauthorized programs, such as malware, from being installed on its point-of-sale and other systems that accessed Payment Card Data and otherwise would have protected Payment Card Data; and

d.    Hy-Vee failed to install software to adequately track access to its network, monitor the network for unusual activity, and prevent exfiltration of data, which would have detected the presence of hackers and prevented Payment Card Data from being stolen.

33.    Attempting to downplay the seriousness of the Data Breach, Hy-Vee advised its customers that "[i]f you see an unauthorized charge, immediately notify the financial institution that issued the card because cardholders are not generally responsible for

unauthorized charges reported in a timely manner."[7] This advice highlights the fact that financial institutions such as Plaintiff will lose millions of dollars as a result of having to cancel and reissue cards compromised in the Hy-Vee Data Breach, refund fraudulent charges incurred by their members/customers, investigate fraudulent charges, and the lost interest and transaction fees due to reduced card usage.

34.    Plaintiff has received fraud alerts from MasterCard indicating that tens of thousands of its customers' credit and debit cards were compromised during the Hy-Vee Data Breach. This includes one or more cards used at Hy-Vee locations within Minnesota.

35.    Plaintiff has already incurred out-of-pocket losses of over $100,000 directly attributable to the Hy-Vee Data Breach.

**C.    Hy-Vee Failed to Comply with Its Duties**

      **1.    Hy-Vee Failed to Comply with Industry Standards for Data Security**

36.    Hy-Vee failed to comply with industry standards for data security and actively mishandled the data entrusted to it by its customers.

37.    The Payment Card Industry Security Standards Council promulgates minimum standards, which apply to all organizations that store, process, or transmit Payment Card Data. These standards are known as the Payment Card Industry Data Security Standard ("PCI DSS"). PCI DSS is the industry standard governing the security

---

[7]    Hy-Vee, Notice of Payment Card Data Incident, Aug. 14, 2019, https://www.hy-vee.com/corporate/news-events/announcements/notice-of-payment-card-data-incident/ (last accessed Jan. 31, 2020).

of Payment Card Data, although it sets the minimum level of what must be done, not the maximum.

38.    PCI DSS version 3.2.1, released in May 2018 and in effect at the time of the Hy-Vee Data Breach, imposes the following 12 "high-level" mandates:[8]

### The PCI Data Security Standard

PCI DSS is the global data security standard adopted by the payment card brands for all entities that process, store or transmit cardholder data and/or sensitive authentication data. It consists of steps that mirror security best practices.

| Goals | PCI DSS Requirements |
|---|---|
| Build and Maintain a Secure Network and Systems | 1.  Install and maintain a firewall configuration to protect cardholder data<br>2.  Do not use vendor-supplied defaults for system passwords and other security parameters |
| Protect Cardholder Data | 3.  Protect stored cardholder data<br>4.  Encrypt transmission of cardholder data across open, public networks |
| Maintain a Vulnerability Management Program | 5.  Protect all systems against malware and regularly update anti-virus software or programs<br>6.  Develop and maintain secure systems and applications |
| Implement Strong Access Control Measures | 7.  Restrict access to cardholder data by business need to know<br>8.  Identify and authenticate access to system components<br>9.  Restrict physical access to cardholder data |
| Regularly Monitor and Test Networks | 10.  Track and monitor all access to network resources and cardholder data<br>11.  Regularly test security systems and processes |
| Maintain an Information Security Policy | 12.  Maintain a policy that addresses information security for all personnel |

39.    Furthermore, PCI DSS 3.2.1 set forth detailed and comprehensive requirements that had to be followed to meet each of the 12 mandates.

---

[8]    PCI Security Standards Council, *PCI DSS Quick Reference Guide: Understanding the Payment Card Industry Data Security Standard version 3.2.1*, 9, July 2018, https://www.pcisecuritystandards.org/documents/PCI_DSS-QRG-v3_2_1.pdf (last accessed Jan. 21, 2020).

40.     Among other things, PCI DSS 3.2.1 requires Hy-Vee to properly secure Payment Card Data; not store cardholder data beyond the time necessary to authorize a transaction; to timely upgrade its point-of-sale software; implement proper network segmentation; encrypt Payment Card Data at the point-of-sale; restrict access to Payment Card Data to those with a need to know; and establish a process to identify; and timely fix security vulnerabilities. Upon information and belief, Hy-Vee failed to comply with each of these requirements.

### 2.     Hy-Vee Failed to Comply with Federal Trade Commission Requirements

41.     According to the Federal Trade Commission ("FTC"), the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by §5 of the Federal Trade Commission Act of 1914 ("FTC Act"), 15 U.S.C. §45.

42.     In 2007, the FTC published guidelines that establish reasonable data security practices for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone may be trying to hack the system; watch

for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

43.    The FTC has also published a document entitled "FTC Facts for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

44.    The FTC has issued orders against businesses that failed to employ reasonable measures to secure Payment Card Data. These orders provide further guidance to businesses in regard to their data security obligations.

45.    Fifth, several states have enacted data breach statutes that impose data security obligations on merchants, such as the Minnesota Plastic Card Security Act, Minn. Stat. § 325E.64, or otherwise require merchants to use reasonable care to guard against unauthorized access to consumer information, such as California Civil Code § 1798.81.5(b) and Wash. Rev. Code § 19.255. States have also adopted unfair and deceptive trade practices acts, which prohibit unfair trade practices, including the failure to employ reasonable security processes to protect payment card data. Moreover, most states have enacted statutes requiring merchants to provide notice if their data security systems are breached. These statutes, implicitly or explicitly, support the use of reasonable data security practices and reflect the public policy of protecting sensitive customer data.

46.    In the years leading up to the Hy-Vee Data Breach, and during the course of the breach itself, Hy-Vee failed to follow the guidelines set forth by the FTC and actively mishandled the management of its IT security. Furthermore, by failing to have reasonable

data security measures in place, Hy-Vee engaged in an unfair act or practice within the meaning of §5 of the FTC Act.

### 3.    The Data Breach Damaged Financial Institutions

47.    Hy-Vee failed to protect its customers' Payment Card Data and as a result, Plaintiff and Class members have and will suffer millions of dollars in damages.

48.    Hy-Vee failed to follow industry standards and failed to effectively monitor its point-of-sale and security systems to ensure the safety of customer information. Hy-Vee's substandard security protocols, improper retention of cardholder data, and failure to regularly monitor for unauthorized access caused customers' Payment Card Data to be compromised for months without detection by Hy-Vee.

49.    The Data Breach caused or will cause substantial damage to Plaintiff and Class members, who are acting immediately to mitigate the risk of a massive number of fraudulent transactions being made on payment cards that they issued while simultaneously taking steps to prevent future fraud. Consumers are ultimately protected from most fraud loss, but Plaintiff and Class members are not. Financial institutions, like Plaintiff and other Class members, bear primary responsibility for reimbursing members/customers for fraudulent charges and covering the cost of issuing new cards for members/customers to use.

50.    As a result of the Hy-Vee Data Breach, Plaintiff and Class members are required, and will continue to be required, to cancel and reissue payment cards, change or close accounts, notify members/customers that their cards were compromised, investigate claims of fraudulent activity, refund fraudulent charges, increase fraud monitoring on

potentially impacted accounts, and take other steps to protect themselves and their members/customers. Plaintiff and members of the Class also lost or will lose interest and transaction fees due to reduced card usage.

51.    Furthermore, the Hy-Vee Data Breach caused significant damage to the Plaintiff's and Class Members' property, specifically, the destruction of all value of the exposed debit and credit cards belonging to Plaintiff and Class members—including the proprietary account data and the physical cards themselves—and the loss of time and money invested in creating those cards.

52.    The financial damages suffered by Plaintiff and members of the Class are significant and ongoing.

## V.    CLASS ACTION ALLEGATIONS

53.    Plaintiff brings this action on behalf of itself and as a class action, pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All banks, credit unions, financial institutions, and other entities in the United States (including its Territories and the District of Columbia) that issued payment cards (including debit or credit cards) used at any Hy-Vee location compromised during the Data Breach that occurred from November 9, 2018 to August 2, 2019.[9]

54.    Excluded from the Class is Defendant and its subsidiaries and affiliates; all employees of Defendant; all persons who make a timely election to be excluded from the

---

[9]    As evidence is developed, Plaintiff may amend the class definition or class period if necessary to accurately correspond to the relevant details of the Data Breach.

Class; government entities; and the judge to whom this case is assigned, including his/her immediate family and court staff.

55.     Certification of Plaintiff's claims for Class-wide treatment is appropriate because all elements of Fed. R. Civ. P. 23(a), (b)(2)-(3) are satisfied. Plaintiff can prove the elements of its claims on a Class-wide basis using the same evidence as would be used to prove those elements in an individual action alleging the same claims.

56.     **Numerosity:** All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are hundreds of members of the Class, the precise number of Class members is unknown to Plaintiff. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

57.     **Commonality and Predominance:** All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.     whether Defendant engaged in the active misfeasance and misconduct alleged herein;

b.     whether Hy-Vee owed a duty to Plaintiff and members of the Class to act reasonably to protect Payment Card Data;

c.    whether Hy-Vee failed to provide adequate security to protect Payment Card Data;

d.    whether Hy-Vee negligently, or otherwise improperly, allowed third parties to access Payment Card Data;

e.    whether Plaintiff and members of the Class were injured and suffered damages and ascertainable losses;

f.    whether Hy-Vee's failure to provide adequate security proximately caused Plaintiff's and Class members' injuries;

g.    whether Plaintiff and members of the Class are entitled to damages and, if so, the measure of such damages; and

h.    whether Plaintiff and members of the Class are entitled to declaratory and injunctive relief.

58.    **Typicality:** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Plaintiff is a member of the Class, having issued payment cards that were compromised in the Hy-Vee Data Breach. Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendant's conduct.

59.    **Adequacy of Representation:** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiff is an adequate Class representative because it is a member of the Class and its interests do not conflict with the interests of the other members of the Class that it seeks to represent. Plaintiff is committed to pursuing this matter for the Class with the Class's collective best interests in mind. Plaintiff has retained counsel competent and

experienced in complex class action litigation of this type and Plaintiff intends to prosecute this action vigorously. Plaintiff, and its counsel, will fairly and adequately protect the Class's interests.

60. **Predominance and Superiority:** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied. As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiff's individual case will also resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

61. **Cohesiveness:** All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied. Defendant has acted, or refused to act, on grounds generally applicable to the Class making final declaratory or injunctive relief appropriate.

## VI.   CAUSES OF ACTION

### COUNT I
**Minnesota Plastic Card Security Act – Minn. Stat. § 325E.64**

62.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

63.   Minn. Stat. § 325.64 is a Minnesota statute that specifically acknowledges Hy-Vee's duty to safeguard transaction payment information owed to financial institutions such as Plaintiff and members of the Class.

64.   Minn. Stat. § 325E.64, subd. 2, imposed a duty upon Hy-Vee not to retain payment information from sales transactions for longer than 48 hours. The statute specifically requires that:

> No person or entity conducting business in Minnesota that accepts an access device in connection with a transaction shall retain the card security code data, the PIN verification code number, or the full contents of any track of magnetic stripe data, subsequent to the authorization of the transaction or in the case of a PIN debit transaction, subsequent to 48 hours after authorization of the transaction. A person or entity is in violation of this section if its service provider retains such data subsequent to the authorization of the transaction or in the case of a PIN debit transaction, subsequent to 48 hours after authorization of the transaction.

65.   Minn. Stat. § 325E.64, subd. 3 details a merchant's responsibilities should it breach the duties imposed by the statute, and then subsequently suffer a data breach. This subdivision provides that:

> Whenever there is a breach of the security of the system of a person or entity that has violated this section, or that person's or entity's service provider, that person or entity shall reimburse the financial institution that issued any access devices affected by the breach for the costs of reasonable actions undertaken by the financial institution as a result of the breach in order to protect the information of its

cardholders or to continue to provide services to cardholders, including but not limited to, any cost incurred in connection with:

(1) the cancellation or reissuance of any access device affected by the breach;

(2) the closure of any deposit, transaction, share draft, or other accounts affected by the breach and any action to stop payments or block transactions with respect to the accounts;

(3) the opening or reopening of any deposit, transaction, share draft, or other accounts affected by the breach;

(4) any refund or credit made to a cardholder to cover the cost of any unauthorized transaction relating to the breach; and

(5) the notification of cardholders affected by the breach.

The financial institution is also entitled to recover costs for damages paid by the financial institution to cardholders injured by a breach of the security of the system of a person or entity that has violated this section. Costs do not include any amounts recovered from a credit card company by a financial institution. The remedies under this subdivision are cumulative and do not restrict any other right or remedy otherwise available to the financial institution.

66.    Hy-Vee "conduct[s] business" in the State of Minnesota.

67.    Hy-Vee regularly accepts "access devices" (debit/credit cards) for the purpose of conducting their business.

68.    Hy-Vee violated Minn. Stat. § 325E.64 by retaining the card security code data, the PIN verification code number, and/or the full contents of Hy-Vee's customers' magnetic stripe data in violation of the statute.

69.    There was a breach of the security of Hy-Vee's systems.

70.     As a direct and proximate result of Hy-Vee's violation of Minn. Stat. § 325E.64, Plaintiff and members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT II
### Negligence
### *On behalf of the Plaintiff and the Class*

71.     Plaintiff incorporates by reference all preceding allegations, as though fully set forth herein.

72.     Hy-Vee owed—and continues to owe—a duty to Plaintiff and the Class to use reasonable care in safeguarding Payment Card Data and to discover any breach in a timely manner, so that compromised financial accounts and credit cards can be closed quickly in order to avoid fraudulent transactions. This duty arises from several sources, including, but not limited to, the sources described below, and is independent of any duty Hy-Vee owed as a result of its contractual obligations.

73.     Hy-Vee has a common law duty to prevent the foreseeable risk of harm to others, including Plaintiff and the Class. It was certainly foreseeable to Hy-Vee that injury would result from a failure to use reasonable measures to protect Payment Card Data and to provide timely notice that a breach was detected. It was also foreseeable that, if reasonable security measures were not taken, hackers would steal Payment Card Data belonging to millions of Hy-Vee's customers; thieves would use Payment Card Data to make large numbers of fraudulent transactions; financial institutions would be required to mitigate the fraud by cancelling and reissuing the compromised cards and reimbursing their

members/customers for fraud losses; and that the resulting financial losses would be immense.

74.    Hy-Vee assumed the duty to use reasonable security measures as a result of its conduct.

75.    In addition to its general duty to exercise reasonable care, Hy-Vee also had a duty of care as a result of the special relationship that existed between Hy-Vee and Plaintiff and members of the Class. The special relationship arose because financial institutions entrusted Hy-Vee with Payment Card Data. Only Hy-Vee was in a position to ensure that its systems were sufficient to protect against the harm to financial institutions from a data breach.

76.    Hy-Vee's duty to use reasonable data security measures also arose under §5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect Payment Card Data by businesses such as Hy-Vee. The FTC publications and data security breach orders described above further form the basis of Hy-Vee's duty. In addition, individual states have enacted statutes based upon the FTC Act that also create a duty on the part of Hy-Vee.

77.    Hy-Vee's duty to use reasonable care in protecting Payment Card Data arose not only as a result of the common law and the statutes described above, but also because it was bound by, and had committed to comply with, industry standards, specifically including PCI DSS.

78.     Hy-Vee breached its common law, statutory, and other duties and thus, was negligent by failing to use reasonable measures to protect Plaintiff's members/customers' Payment Card Data from the hackers who perpetrated the Data Breach and by failing to provide timely notice of the breach. Upon information and belief, the specific negligent acts and omissions committed by Hy-Vee include, but are not limited to, some, or all, of the following:

a.      failure to delete cardholder information after the time period necessary to authorize the transaction;

b.      failure to employ systems to protect against malware;

c.      failure to comply with industry standards for software and point-of-sale security;

d.      failure to track and monitor access to its network and cardholder data;

e.      failure to limit access to those with a valid purpose;

f.      failure to adequately staff and fund its data security operation;

g.      failure to use due care in hiring, promoting, and supervising those responsible for its data security operations; and

h.      failure to recognize that hackers were stealing Payment Card Data from its network while the Data Breach was taking place.

79.     In connection with the conduct described above, Hy-Vee acted wantonly, recklessly, and with complete disregard for the consequences.

80.     As a direct and proximate result of Hy-Vee's negligence, Plaintiff and members of the Class have or will suffer injury, including, but not limited to, cancelling

and reissuing payment cards, changing or closing accounts, notifying members/customers that their cards were compromised, investigating claims of fraudulent activity, refunding fraudulent charges, increasing fraud monitoring on potentially impacted accounts, and taking other steps to protect themselves and their members/customers. Plaintiff and the Class also lost or will lose interest and transaction fees, due to reduced card usage resulting from the breach.

81.    Hy-Vee's negligence caused Plaintiff and the Class to suffer property damage, as the physical payment cards and associated account numbers exposed in the Data Breach were all rendered completely useless and valueless for their intended purposes.

**COUNT III**
**Negligence *Per Se***
***On behalf the Plaintiff and the Class***

82.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

83.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Hy-Vee, of failing to use reasonable measures to protect Payment Card Data. The FTC publications and orders described above also form part of the basis of Hy-Vee's duty.

84.    Hy-Vee violated §5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Payment Card Data and not complying with applicable industry standards, including PCI DSS, as described in detail herein. Hy-Vee's conduct

was particularly unreasonable given the nature and amount of Payment Card Data it obtained and stored and the foreseeable consequences of a data breach at one of the country's largest private companies, including, specifically, the immense damages that would result to consumers and financial institutions.

85.    Hy-Vee's violation of §5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

86.    Plaintiff and members of the Class are within the class of persons that §5 of the FTC Act (and similar state statutes) was intended to protect, as they are engaged in trade and commerce and bear primary responsibility for directly reimbursing consumers for fraud losses. Moreover, many of the Class members are credit unions, which are organized as cooperatives whose members are consumers.

87.    The harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over 50 enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and the Class.

88.    Moreover, as described above, Hy-Vee also violated Minn. Stat. § 325E.64 by improperly retaining the card security code data, the PIN verification code number, and/or the full contents of Hy-Vee's customers' magnetic stripe data from credit and debit cards issued by Plaintiff and members of the Class.

89.    Plaintiff and members of the Class suffered harm, including, but not limited to, costs for reissuing credit/debit cards, changing or closing accounts, opening or

reopening accounts, refunding or crediting cardholder accounts in response to fraudulent charges, issuing notice to potentially effected cardholders, and other actions necessary to rectify, prevent, and/or mitigate fraud as a result of Hy-Vee's violation of Minnesota's Plastic Card Security Act, Minn. Stat. § 325E.64.

90.    Plaintiff and members of the Class are entities that the Minnesota legislature intended to be protected by Minnesota's Plastic Card Security Act, Minn. Stat. § 325E.64.

91.    The injuries suffered by Plaintiffs and members of the Class were directly and proximately caused by Hy-Vee's violation of Minnesota's Plastic Card Security Act, Minn. Stat. § 325E.64.

92.    Hy-Vee's violation of the Minnesota's Plastic Card Security Act, Minn. Stat. § 325E.64, thus constitutes negligence per se.

93.    As a direct and proximate result of Hy-Vee's negligence *per se*, Plaintiff and the Class have or will suffer injury, including, but not limited to, cancelling and reissuing payment cards, changing or closing accounts, notifying members/customers that their cards were compromised, investigating claims of fraudulent activity, refunding fraudulent charges, increasing fraud monitoring on potentially impacted accounts, and taking other steps to protect themselves and their members/customers. They also lost or will lose interest and transaction fees, due to reduced card usage resulting from the breach, and the cards they issued (and the corresponding account numbers) were rendered worthless.

## COUNT IV
### Declaratory and Injunctive Relief
### *On behalf of Plaintiff and the Class*

94.     Plaintiff incorporates by reference all preceding allegations, as though fully set forth herein.

95.     Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, which are tortious and which violate the terms of the federal and state statutes described herein.

96.     An actual controversy has arisen in the wake of Hy-Vee's Data Breach regarding its common law and other duties to reasonably safeguard Payment Card Data. Plaintiff alleges that Hy-Vee's data security measures were inadequate and remain inadequate. Furthermore, Plaintiff continues to suffer injury as additional fraudulent charges may be made on payment cards it issued to Hy-Vee's customers.

97.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.     Hy-Vee continues to owe a legal duty to secure its customers' personal and financial information—specifically including information pertaining to credit and debit cards used by Hy-Vee's customers—and to notify financial institutions of a data breach under the common law, §5 of the FTC Act, PCI DSS standards, its commitments, and various state statutes;

b.      Hy-Vee continues to breach this legal duty by failing to employ reasonable measures to secure its customers' personal and financial information; and

c.      Hy-Vee's ongoing breaches of its legal duty continue to cause Plaintiff harm.

98.     The Court also should issue corresponding injunctive relief requiring Hy-Vee to employ adequate security protocols, consistent with industry standards, to protect its Payment Card Data. Specifically, this injunction should, among other things, direct Hy-Vee to:

a.      utilize industry standard encryption to encrypt the transmission of cardholder data at the point-of-sale and at all other times;

b.      implement encryption keys in accordance with industry standards;

c.      implement EMV technology;

d.      engage third party auditors, consistent with industry standards, to test its systems for weakness and upgrade any such weakness found;

e.      audit, test, and train its data security personnel regarding any new or modified procedures and how to respond to a data breach;

f.      regularly test its systems for security vulnerabilities, consistent with industry standards;

g.      comply with all PCI DSS standards pertaining to the security of its customers' personal and confidential information; and

h.      install all upgrades recommended by manufacturers of security software and firewalls used by Hy-Vee.

99.    If an injunction is not issued, Plaintiff will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Hy-Vee. The risk of another such breach is real, immediate, and substantial. If another breach at Hy-Vee occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for out of pocket damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable and reputational damage.

100.    The hardship to Plaintiff and the Class, if an injunction is not issued, exceeds the hardship to Hy-Vee, if an injunction is issued. Among other things, if another massive data breach occurs at Hy-Vee, Plaintiff and members of the Class will likely incur hundreds of millions of dollars in damage. On the other hand, the cost to Hy-Vee of complying with an injunction by employing reasonable data security measures is relatively minimal and Hy-Vee has a pre-existing legal obligation to employ such measures.

101.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Hy-Vee, thus eliminating the injuries that would result to Plaintiff, the Class, and the millions of consumers whose confidential information would be compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

A.      Certify the Class and appoint Plaintiff and Plaintiff's counsel to represent the Class;

B.      Enter a monetary judgment in favor of Plaintiff and members of the Class to compensate them for the injuries suffered, together with pre-judgment and post-judgment interest, treble damages, and penalties where appropriate;

C.      Enter a declaratory judgment in favor of Plaintiff and the Class, as described above;

D.      Grant Plaintiff the injunctive relief requested;

E.      Award Plaintiff and the Class reasonable attorneys' fees and costs of suit, as allowed by law; and

F.      Award such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of any and all issues in this action so triable.

Dated: February 27, 2020                    Respectfully submitted,

*/s/ Kate M. Baxter-Kauf*

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Karen Hanson Riebel (MN #219770)
Kate M. Baxter-Kauf (MN #392037)
Stephen M. Owen (MN #399370)
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Fax: (612) 339-0981
khriebel@locklaw.com
kmbaxter-kauf@locklaw.com
smowen@locklaw.com

**CHESTNUT CAMBRONNE PA**
Karl L. Cambronne (MN #14321)

Bryan L. Bleichner (MN #0326689)
17 Washington Avenue North, Suite 300
Minneapolis, MN 55401-2048
Telephone: (612) 339-7300
Fax: (612) 336-2940
kcambronne@chestnutcambronne.com
bbleichner@chestnutcambronne.com

**CARLSON LYNCH, LLP**
Gary F. Lynch (PA ID 56887)
Jamisen A. Etzel (PA ID 311554)
Kevin W. Tucker (PA ID 312144)
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel. (412) 322-9243
glynch@carlsonlynch.com
jetzel@carlsonlynch.com
ktucker@carlsonlynch.com

**BERMAN FINK VAN HORN P.C.**
Charles H. Van Horn (GA Bar No. 724710)
3475 Piedmont Road, NE Suite 1100
Atlanta, GA 30305
Telephone: 404.261-7711
Facsimile: 404.233.1943
cvanhorn@bfvlaw.com

*Counsel for Plaintiffs*